UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>VAN T. DINH | CRIMINAL NO 4:03CR 40035-NMG<br><br>18 U.S.C. § 1030<br>(Unauthorized Computer Access<br>  in Furtherance of Fraud<br>18 U.S.C. § 1343<br>(Wire Fraud)<br>18 U.S.C. § 1348(1)<br>(Securities Fraud)<br>15 U.S.C. §§ 78(j)(b) and<br>  78ff(a) and 17 C.F.R. §<br>  240.10b-5<br>(Securities Fraud)<br>18 U.S.C. § 981 and 28<br>  U.S.C. § 2461(c)<br>(Forfeiture) |

INDICTMENT

INTRODUCTION

The Grand Jury charges that:

1.  At all times material to this Indictment, VAN T. DINH ("Dinh") was an individual who resided at 236 4th Avenue, Phoenixville, Pennsylvania 19460.

2.  At all times relevant to this indictment, Dinh maintained an account with CyberTrader, a Charles Schwab Company, which allowed him to make online trades.

3.  At all times material to this Indictment, the individual identified herein as "the Investor" resided in the District of Massachusetts. Further, at all times material to this Indictment, the Investor maintained a brokerage account with TD Waterhouse.

4. From June 18 through June 27, 2003 Dinh purchased approximately 9,120 put option contracts for the common stock of Cisco Systems, Inc. ("Cisco") at the strike price of $15.00 per share, expiration date July 19, 2003, through his online trading account at Cybertrader.com at a cost of approximately $91,200.00 (the "Cisco options" or the "July 15 puts"). Each put contract gave him the right to sell 100 shares of Cisco common stock at $15.00 per share, if the share value fell to that price or below, until the contract's expiration on July 19, 2003. More specifically, if Cisco's common stock fell to a price below the puts' $15 strike price, Dinh stood to make a substantial return on his investment. In fact, Dinh stood to receive approximately $9,120, before transaction costs, for every penny below $15 that Cisco common shares traded at the time Dinh elected to exercise his July 15 puts. In contrast, however, if Cisco common stock remained at prices above $15 per share, and if Dinh was otherwise unable to sell the July 15 puts within the options period, i.e. on or before July 19, 2003, they would expire worthless. If this happened, Dinh would be unable to recoup any of his $91,200 investment.

5. Cisco is a public company, whose shares are registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12(g) of the Securities Exchange Act and are publically traded "over the counter" on the NASDAQ National Market System, a national securities exchange. The Cisco options were traded on the Chicago Board of Options Exchange ("CBOE"), an exchange registered with the SEC for the trading of various options.

## THE SCHEME TO DEFRAUD

6. By July 6, 2003, Cisco common shares continued to trade publicly at prices significantly above the options' $15 strike price. For example, on July 3, 2003, Cisco's common stock closed at $17.52 with an intraday high of $17.88. Similarly, on July 6, 2003, Cisco common stock closed at $18.22 with an intraday high of $18.25. Thus, by the close of business on July 6, 2003, it was appearing increasingly unlikely that Dinh would be able to exercise the July 15 puts at a profit, and correspondingly likely that he would suffer a loss on his investment.

7. The next day, on July 7, 2003, the Investor, a member of Stockcharts.com's stock-charting forum, received a seemingly benign message from an individual named "Stanley Hirsch", that originated from email address infogoldrain@utvinternet.com, in which "Stanley Hirsch" asked if the members maintained their own websites. The Investor responded to this inquiry, thus providing his personal email address to "Stanley Hirsch."

8. On July 8, 2003, following his response to "Stanley Hirsch", the Investor, through his personal email address, received an email invitation to participate in a so-called "beta test" of a new stock-charting tool. This email originated from email address TonyRiechert@myrealbox.com. The sender, identified as "Tony T. Riechert," provided a link in the email message to enable the Investor to download a computer program that purported to be the stock-charting application.

9. The purported application sent to the Investor was actually a disguised "Trojan horse" that contained a series of

"keystroke-logging" programs. Keystroke-logging programs such as these enable one Internet user to remotely monitor the actual keystrokes of another Internet user, in this case the Investor, who unsuspectingly installed the programs on his computer. A "Trojan horse" is a program in which malicious or harmful code is concealed or hidden inside apparently harmless programming or data, in such a way that it can get control of the breached computer and do its chosen form of damage (for example, as in the instant case, logging keystrokes on the victim computer).

10. Email address infogoldrain@utvinternet.com, the originating address for the "Stanley Hirsch" email, and email address TonyRiechert@myrealbox.com, the originating address for the Tony Reichert email, were both email addresses used by Dinh.

11. Once the Investor installed the program on his computer, Dinh was able to use the keystroke-logging programs to identify an online TD Waterhouse account held by the Investor and to extract the password and login information for that account. After being intercepted by the key stroke logging program, the key stroke data was sent to email address kslogs@utvinternet.com, an email server located in Ireland with a return address of ksupdate@gmx.net, an email server located in Germany. This ensured that key stroke data that could not be delivered to the kslogs email account would then be delivered to the ksupdate account, rather than being returned to the Investor's account.

12. Email addresses kslogs@utvinternet.com and ksupdate@gmx.net were also both email addresses used by Dinh.

13. On July 10, 2003, approximately nine days before the expiration date of the Cisco options, Cisco's stock was trading at approximately $19 per share, making it likely that Dinh's $15 Cisco put options would be worthless at the time they expired.

14. On July 11, 2003, Dinh accessed his CyberTrader account and placed an order to sell 1,000 of the July 15 puts at a price of $5 per contract. Because the Cisco common stock was still trading well above the July 15 puts' $15 strike price, Dinh's sell order remained unexecuted for approximately 90 minutes, reflecting the fact that there was no market for the puts at $5 per contract.

15. In order to create a market for the puts, unbeknownst to the Investor and without his authorization, Dinh accessed the Investor's TD Waterhouse account and placed buy orders for the July 15 puts, making it appear as though the Investor wanted to purchase those puts.

16. These initial buy orders were executed in lots of 100 on the CBOE and were filled with the 1,000 July 15 puts from Dinh's CyberTrader account, resulting in pre-commission proceeds to Dinh of approximately $5,000.

17. During the hours that followed, Dinh placed a series of similar sell orders at $5 per contract in an effort to dispose of the remainder of his July 15 puts prior to their expiration date. Shortly after the placement of each sell order in his CyberTrader account, Dinh placed a corresponding buy order from the Investor's TD Waterhouse account.

18. In total, on July 11, buy orders from the Investor's TD Waterhouse account representing 7,200 July 15 puts were executed

against sell orders from Dinh's CyberTrader account. This represented 72 wire transfers from the Investor's TD Waterhouse account. As a result of these transactions, the Investor lost approximately $46,986, consisting of approximately $37,000 paid to Dinh for his options and almost $10,000 in commissions. This depleted virtually all of the cash in the Investor's TD Waterhouse account and enabled Dinh to avoid at least $37,000 of losses. Dinh's remaining sell orders, representing approximately 1,980 July puts, remained unexecuted as there existed no buyer in the marketplace willing to purchase these options at a price of $5 per contract and there was insufficient cash in the Investor's TD Waterhouse account to purchase the remaining July 15 puts. These remaining puts ultimately expired worthless.

## COUNT ONE

(Unauthorized Access to a Computer - 18 U.S.C. § 1030(a)(4))

The Grand Jury further charges that:

19. Paragraphs 1-18 are realleged and incorporated by reference as though fully set forth herein.

20. At sometime between approximately July 7, 2003 and July 11, 2003, in the District of Massachusetts, the Eastern District of Pennsylvania and elsewhere, the defendant,

VAN T. DINH

knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded his authorized access, and by means of such conduct furthered the intended fraud and obtained a thing of value, to wit: Dinh, without authorization and in excess of whatever authorization he may have had, accessed the Investor's computer system, obtained information relevant to the Investor's TD Waterhouse account and used that information in furtherance of his scheme to fraudulently obtain funds from the Investor's account.

In violation of Title 18, United States Code, Section 1030(a)(4).

## COUNT TWO

(Securities Fraud - Title 15, United States Code, Sections 78j(b) and 78ff(a) and 17 C.F.R. §240.10b-5)

The Grand Jury further charges that:

21. Paragraphs 1-18 are realleged and incorporated by reference as though fully set forth herein.

22. Beginning on approximately July 7, 2003 and continuing until at least July 11, 2003, in the District of Massachusetts, the Eastern District of Pennsylvania and elsewhere, the defendant,

## VAN T. DINH

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce and the mails, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security in contravention of Rule 10b-5 (17 C.F.R. Section 240.10B-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of put option contracts for the common stock of Cisco.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and 17 C.F.R. §240.10b-5.

<u>COUNT THREE</u>

(Securities Fraud - 18 U.S.C. § 1348(1))

The Grand Jury further charges that:

23. Paragraphs 1-18 are realleged and incorporated by reference as though fully set forth herein.

24. Beginning on approximately July 7, 2003 and continuing until at least July 11, 2003, in the District of Massachusetts, the Eastern District of Pennsylvania and elsewhere, the defendant,

VAN T. DINH

knowingly executed and attempted to execute the above-described scheme and artifice to defraud the Investor in connection with securities of Cisco, an issuer with a class of securities registered under section 12 of the Securities and Exchange Act of 1934.

All in violation of Title 18, United States Code, Section 1348(1).

## COUNTS FOUR THROUGH EIGHT

(Wire Fraud - 18 U.S.C. § 1343)

The Grand Jury further charges that:

25. Paragraphs 1-18 are realleged and incorporated by reference as though fully set forth herein.

26. Beginning on approximately July 7, 2003 and continuing until at least July 11, 2003, in the District of Massachusetts, the Eastern District of Pennsylvania and elsewhere, the defendant,

## VAN T. DINH

having devised and intending to devise the above-described scheme to defraud and to obtain money and property by false and fraudulent pretenses and representations, transmitted and caused to be transmitted by wire in interstate communication and foreign commerce, writings, signs and signals for the purpose of executing such scheme and artifice, a representative sampling of which wires is set forth below:

| COUNT | DATE | WIRE |
|---|---|---|
| 4 | 7/11/03 | $500 wired from Investor's TD Waterhouse account for order executed at approximately 13:49:55 as payment for buy order for 100 July 15 puts placed by Dinh from the Investor's TD Waterhouse account and executed against a sell order from Dinh's CyberTrader account. |
| 5 | 7/11/03 | $500 wired from Investor's TD Waterhouse account for order executed at approximately 13:06:14 as payment for buy order for 100 July 15 puts placed by Dinh from the Investor's TD Waterhouse account and executed against a sell order from Dinh's CyberTrader account. |

| 6 | 7/11/037 | $500 wired from Investor's TD Waterhouse account for order executed at approximately 12:46:16 as payment for buy order for 100 July 15 puts placed by Dinh from the Investor's TD Waterhouse account and executed against a sell order from Dinh's CyberTrader account. |
|---|---|---|
| 7 | 7/11/03 | $500 wired from Investor's TD Waterhouse account for order executed at approximately 12:30:27 as payment for buy order for 100 July 15 puts placed by Dinh from the Investor's TD Waterhouse account and executed against a sell order from Dinh's CyberTrader account. |
| 8 | 7/11/03 | $500 wired from Investor's TD Waterhouse account for order executed at approximately 12:22:19 as payment for buy order for 100 July 15 puts placed by Dinh from the Investor's TD Waterhouse account and executed against a sell order from Dinh's CyberTrader account. |

All in violation of Title 18, United States Code, Section 1343.

FORFEITURE ALLEGATIONS

(18 U.S.C. § 981 and 28 U.S.C. § 2461(c))

27. As a result of the offenses in violation of Title 18, United States Code, Section 1343 charged in Counts Four through Eight of this Indictment, the defendant,

VAN T. DINH

shall forfeit all property, real and personal, that constitutes, or is derived from, proceeds traceable to the commission of the offense, including but not limited to the $46,986 taken from the Investor's account.

28. If the above-described forfeitable property, as a result of any act or omission of the defendant:

- (1) cannot be located upon the exercise of due diligence;
- (2) has been transferred or sold to, or deposited with, a third person;
- (3) has been placed beyond the jurisdiction of the Court;
- (4) has been substantially diminished in value; or
- (5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property. All in violation of Title 18, United States Code, Section 981 and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Jonathan L. Kotlier
Allison D. Burroughs
Assistant U.S. Attorneys

DISTRICT OF MASSACHUSETTS; October 23, 2003.

Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

15:55 pm.